# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                        No. CR 09-0767 JB

FRANCISCO JAVIER RODRIGUEZ-GAMBOA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing, filed May 21, 2009 (Doc. 19).  The Court held an evidentiary hearing on August 12, 2009.  The primary issues are (i) whether Hidalgo County, New Mexico Sheriff's Deputy Joseph Flores had reasonable suspicion to believe that Defendant Francisco Javier Rodriguez-Gamboa violated a traffic law when he conducted a traffic stop on December 13, 2008; and (ii) whether Flores had reasonable suspicion or probable cause sufficient to justify detention of Rodriguez-Gamboa after the traffic stop occurred.  Because Flores executed a lawful traffic stop based on an observed traffic violation, the evidence seized was not fruit of the poisonous tree, and the Court will deny Defendant's motion to suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      In the early morning hours of December 13, 2008, Rodriguez-Gamboa was traveling on Interstate 10 ("I-10") in Hidalgo County, near Lordsburg, New Mexico.  See Hearing Transcript at 8:5-16 (taken August 12, 2009)("Tr.")[1] (Flores); id. at 83:16-19 (Rodriguez-Gamboa); Exhibit I.[2]

2.      Hidalgo County Sheriff's Deputy Joseph Flores was participating in a DWI operation on I-10, accompanied by a training officer, Lorenzo Rivera.  See Tr. at 7:18 (Flores); id. at 45:23-46:15 (Robbenhaar, Flores); Exhibit I.

3.      Flores observed a car that Rodriguez-Gamboa was driving.  See Tr. at 8:5-11 (Flores, Cairns); Exhibit I.

4.      Flores first noticed Rodriguez-Gamboa on I-10.  See Tr. at 8:12-18 (Flores, Cairns);

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[2] Rodriguez-Gamboa asserted in his motion and in the hearing that he was traveling eastbound, heading to El Paso, Texas.  See Tr. at 83:19-25 (Rodriguez-Gamboa, Robbenhaar); Motion at 1.  Flores testified in the hearing that he first observed Rodriguez-Gamboa traveling westbound, headed towards Arizona.  See Tr. at 8:16, 28:23-24 (Flores).  Though the Court takes note of the discrepancy, and finds that Rodriguez-Gamboa was traveling eastbound and that Flores' testimony is in error, the Court notes that the direction that Rodriguez-Gamboa was traveling before exiting I-10 is not particularly relevant to whether he later went in the wrong direction onto an exit ramp.  The Court further does not find that such a discrepancy lends any additional weight to Rodriguez-Gamboa's contention that Flores generally is not credible.

Exhibit I.

5.      On December 13, 2008, Rodriguez-Gamboa was traveling alone on I-10.  <u>See</u> Tr. at 32:15 (Flores).

6.      Flores followed Rodriguez-Gamboa to observe whether Rodriguez-Gamboa was swerving on the road, or was exhibiting other signs of intoxication, and did not observe either.  <u>See</u> Tr. at 8:22-9:11 (Flores, Cairns).

7.      Rodriguez-Gamboa did not see, and was not aware, that a patrol unit was following him.  <u>See</u> Tr. at 85:12-15 (Rodriguez-Gamboa).

8.      At approximately 1:20 a.m., Rodriguez-Gamboa used Exit 20, the next available exit in Lordsburg, to exit I-10.[3]  <u>See</u> Tr. at 23:11-13 (Flores); <u>id.</u> at 85:1-10 (Robbenhaar, Rodriguez-Gamboa); Exhibit A1.

9.      The first gasoline station Rodriguez-Gamboa drove to was closed, so he drove to a Love's truck stop nearby.  <u>See</u> <u>Tr.</u> at 85:18-86:3 (Robbenhaar, Rodriguez-Gamboa);<u>id.</u> at 29:5-7 (Robbenhaar, Flores); Exhibit A2; Exhibit A4; Exhibit A5.

10.      Flores also exited off of I-10 onto Motel Drive, but did not initially follow Rodriguez-Gamboa; rather, Flores kept heading eastbound on Motel Drive.  <u>See</u> Tr. at 73:2-3 (Flores).

11.      Flores ran Rodriguez-Gamboa's license plate on the computer in his squad car, which indicated that there was no driver's license associated with the vehicle.  <u>See</u> Tr. at 75:1-10 (Flores).

12.      After receiving the report, Flores turned around and found Rodriguez-Gamboa's

_____

[3] In his motion, Rodriguez-Gamboa contends that he used Exit 20B.  <u>See</u> Motion at 1.  At the hearing, however, he testified that he used Exit 20A.  <u>See</u> Tr. 85:1-10 (Robbenhaar, Rodriguez-Gamboa).  The Court notes that one can exit from Exit 20A or 20B to Motel Drive in both the east and west directions.

vehicle parked at the Love's truck stop.  See Tr. at 75:10-13 (Flores); id. at 77:20-24 (Flores).

13.     Flores re-established visual contact with Rodriguez-Gamboa, who was then in his vehicle.  See Tr. at 75:10-13 (Flores); id. at 77:20-24 (Flores).

14.     Rodriguez-Gamboa purchased $20.00 worth of gas and a cup of coffee.  See Tr. at 86:8-11; id. at 87:15-25; Exhibit H; Exhibit A3; Exhibit A4.

15.     Flores did not have visual contact with Rodriguez-Gamboa's vehicle continually from the time Rodriguez-Gamboa entered the Love's truck stop until he left, because Flores did not initially follow Rodriguez-Gamboa to the truck stop.  See Tr. at 73:24-74:3 (Cairns, Flores).

16.     When Flores re-established visual contact, he observed Rodriguez-Gamboa through binoculars.  See Tr. at 71:15-20; id. at 78:5-6 (Flores).

17.     Flores did not observe Rodriguez-Gamboa exit his vehicle.  See Tr. at 12:8-12 (Flores); id. at 31:24-32:1 (Robbenhaar, Flores).

18.     Flores did not observe Rodriguez-Gamboa purchase any fuel from the truck stop. See Tr. at 31:23, 73:14 (Flores).

19.     Rodriguez-Gamboa left the Love's truck stop, entered Motel Drive, and began driving back to I-10 to access the overpass and reach the on-ramp to eastbound I-10.  See Tr. at 89:23-24 (Rodriguez-Gamboa); id. at 91:15-19 (Rodriguez-Gamboa); Exhibit A7.[4]

20.     As he was leaving, Rodriguez-Gamboa noticed in his left mirror a police car behind him with its headlights off.  See Tr. at 92:13-15 (Rodriguez-Gamboa).

_____

[4] The amount of time Rodriguez-Gamboa spent at the Love's truck stop is in dispute.  Flores contends that Rodriguez-Gamboa was parked there for approximately four to five minutes.  See Tr. at 74:20-21.  Rodriguez-Gamboa at first stated that he was at the Love's truck stop for about fifteen to twenty minutes, then later stated that he was there for thirty-five minutes.  See Tr. at 89:16 (Rodriguez-Gamboa); id. at 114:9-10 (Rodriguez-Gamboa).

-4-

21.     To arrive at the eastbound off/exit ramp from the Love's truck stop, Rodriguez-Gamboa had to travel over I-10, across an overpass.  <u>See</u> Tr. at 92:24-93:3 (Rodriguez-Gamboa, Robbenhaar); Exhibit A7; Exhibit J.

22.     Flores followed Rodriguez-Gamboa back towards I-10.  <u>See</u> Tr. at 12:23-24 (Flores).

23.     Flores again observed Rodriguez-Gamboa watching him and observed that he seemed nervous.  <u>See</u> Tr. at 13:10-15 (Flores).

24.     That the police vehicle was following him surprised Rodriguez-Gamboa.  <u>See</u> 93:14-20 (Rodriguez-Gamboa).

25.     Rodriguez-Gamboa made a left turn off the overpass and drove his vehicle the wrong direction onto the exit ramp for I-10 eastbound traffic, driving opposite the direction of traffic.  <u>See</u> Tr. at 14:24-15:4 (Flores); <u>id.</u> 35:15-36:2 (Robbenhaar, Flores); <u>id.</u> at 95:19-23; Exhibit A8.

26.     The exit ramp was clearly marked with a no-entry sign.  <u>See</u> Tr. at 13:10-15 (Flores); <u>id.</u> at 38:6-7 (Flores); <u>id.</u> 97:20-23 (Rodriguez-Gamboa).

27.     Flores engaged his emergency lights after Rodriguez-Gamboa entered the exit ramp in the wrong direction and stopped Rodriguez-Gamboa's vehicle.  <u>See</u> Tr.  at 15:9-10; <u>id.</u> at 38:2-7 (Robbenhaar, Flores).

28.     Flores had not previously engaged his emergency lights or chirped his siren.  <u>See</u> Tr. at 39:4-10 (Robbenhaar, Flores).[5]

---

[5] Rodriguez-Gamboa states that he entered the exit ramp because Flores "sparked" his lights -- briefly lit up his lights -- and motioned with his left hand out the window to Rodriguez-Gamboa. <u>See</u> Tr. at 95:14-25 (Rodriguez-Gamboa).  The Court credits Flores' testimony on this issue rather than Rodriguez-Gamboa's, because the Court does not find Rodriguez-Gamboa's contention, that Flores directed -- with hand motions in the middle of the night -- Rodriguez-Gamboa to enter an exit ramp in the wrong direction, to be a plausible explanation for why Rodriguez-Gamboa entered the ramp against the flow of traffic.  Rodriguez-Gamboa also contends that there was no shoulder on the overpass where he could have pulled over when Flores "sparked" his lights.  <u>See</u> Tr. at 95:6-13

29.     Flores did not engage his siren, because it was broken.   See Tr. at 39:7-10 (Robbenhaar, Flores).

30.     Flores did not signal Rodriguez-Gamboa with his hands to pull onto the exit ramp or signal for him to move his vehicle to a specific location.   See Tr. at 49:22-50:1 (Robbenhaar, Flores).

31.     Flores conducted a traffic stop based upon Rodriguez-Gamboa's driving the wrong way on a one-way exit ramp.   See Tr. at 36:3-7 (Robbenhaar, Flores).

32.     Flores stopped Rodriguez-Gamboa at approximately 1:41 a.m.   See Tr. at 21:20-22 (Robbenhaar, Flores).[6]

33.     Flores did not engage the digital dash-cam video machine and failed to record the traffic stop, because there was no memory on the hard drive.   See Tr. at 39:15-40:6 (Robbenhaar, Flores); Exhibit F.

34.     It is department policy for officers to maintain and use digital dash-cam video machines in their patrol units.   See Tr. at 60:19-24 (Robbenhaar, Arredondo).

35.     Lorenzo Rivera, the deputy riding with Flores, stood out on the ramp with a flashlight to ensure that no vehicles were coming off the exit ramp.   See Tr. at 15:21-25 (Flores); id. at 45:23-

_____

(Rodriguez-Gamboa).  After careful review of the testimony and of the exhibits depicting I-10 at exit 20, the Court observes that there is an ample shoulder on the overpass, see Exhibit A8, and also accepts Flores' explanation that Rodriguez-Gamboa's visible nervousness, likely caused by Flores' police vehicle following him, flustered Rodriguez-Gamboa, resulting in him mistakenly taking a left onto an exit ramp instead of properly re-entering eastbound I-10 at the following left turn.  See Tr. at 13:10-15 (Flores); Exhibit A8; Exhibit J.

[6] In his reply, Rodriguez-Gamboa contends that Flores stopped him at approximately 1:54 a.m.  See Defendant's Reply to the Government's Response to Defendant's Motion to Suppress Evidence at 1, filed July 6, 2009 (Doc. 27).  The radio log, created by the radio dispatcher in communication with Flores, however, indicated the stop occurred at 1:41a.m.  See Exhibit E.  The Court bases its finding on the radio log, which the Court finds to be reliable evidence.

46:6 (Flores).

36.     Flores approached Rodriguez-Gamboa.  See Tr. at 15:25-16:1 (Flores).

37.     Flores asked Rodriguez-Gamboa for a driver's license, registration, and proof of insurance.  See Tr. at 16:3-10 (Flores).

38.     Rodriguez-Gamboa did not have a valid driver's license.  See Tr. at 16:22-25 (Flores).[7]

39.     Flores asked Rodriguez-Gamboa why he did not have a driver's license, and Rodriguez-Gamboa stated that he was in the United States illegally.  See Tr. at 16:22-25 (Flores).

40.     Flores issued a citation to Rodriguez-Gamboa for driving without a valid driver's license, contrary to New Mexico Statutes Annotated 1978 § 66-5-2.  See Tr. at 49:1-16 (Robbenhaar, Flores); Exhibit B.

41.     Flores did not issue Rodriguez-Gamboa a citation for driving the wrong way on a one-way road.  See Tr. at 49:11-16 (Robbenhaar, Flores).

42.     Flores contacted the United States Border Patrol, which has a station nearby.  See Tr. at 17:1-3 (Cairns, Flores).

43.     Flores detained Rodriguez-Gamboa until a Border Patrol agent arrived and arrested Rodriguez-Gamboa.  See Tr. at 17:4-9 (Flores).

## PROCEDURAL BACKGROUND

Based upon Flores' traffic stop, the Border Patrol filed a criminal complaint in the Court charging Rodriguez-Gamboa with illegal re-entry.  See Criminal Complaint, filed December 15, 2008 (Doc. 1); Motion at 3.  A federal grand jury indicted Rodriguez-Gamboa on a charge of

---

[7] Rodriguez-Gamboa states he had a Mexican driver's license from the state of Veracruz. See Tr. at 118:9-11 (Rodriguez-Gamboa).

illegally re-entering the United States after deportation.  See Amended Response to Defendant's Motion to Suppress Evidence, filed August 11, 2009 (Doc. 32)("Response").  Rodriguez-Gamboa now moves the Court to suppress the evidence that the United States may use to prove its case at trial -- fingerprints, statements, alien-registration file, and other evidence of Rodriguez-Gamboa's identity -- as fruits of an illegal seizure.  See Motion at 7-8.

Rodriguez-Gamboa argues that Flores lacked reasonable suspicion to believe that Rodriguez-Gamboa violated a traffic law of the state of New Mexico.  Rodriguez-Gamboa argues that, although Border Patrol agents can verify that Rodriguez-Gamboa's vehicle was parked on the exit ramp leading from I-10, the only proof regarding Rodriguez-Gamboa's driving is the testimony of Flores.  Rodriguez-Gamboa suggests that Flores' stop was pre-textual and that, although that alone is not a basis for suppression, it should go to the weight of Flores' credibility.  Rodriguez-Gamboa argues that, at most, Flores' stated reason for the traffic stop amounts to an inchoate and unparticularized suspicion or hunch, and not reasonable suspicion.

The United States responds that Rodriguez-Gamboa driving the wrong way onto an exit ramp of I-10 was sufficient justification for the traffic stop.  The United States argues that, although driving the wrong way onto an exit ramp it is not a serious offense, it is dangerous and in violation of New Mexico Statutes Annotated Section 66-7-316.  The United States further argues that a longer investigatory stop was warranted when Rodriguez-Gamboa did not have a driver's license.  The United States contends that a police officer may make an arrest for a misdemeanor -- as both failing to obey a traffic sign and driving without a license are -- if the officer has probable cause to believe that an offense is being committed in his presence, and Flores had such probable cause to arrest Rodriguez-Gamboa.  See Response at 5 (citing State v. Salas, 127 N.M. 686, 690, 986 P.2d 482, 486 (Ct App. 1999)).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. The hallmark of the Fourth Amendment is reasonableness.  Accordingly, for Fourth-Amendment purposes, there are three categories of police/citizen encounters: (i) consensual or voluntary encounters; (ii) <u>Terry</u> stops or analogous investigative detentions; and (iii) arrests.  <u>See United States v. Griffin</u>, 7 F.3d 1512, 1516 (10th Cir. 1993).  What the police may do depends on the category of encounter.

### 1.      <u>Consensual Encounters.</u>

Consensual encounters are "characterized by the voluntary cooperation of a citizen in response to noncoercive questioning."  <u>United States v. Griffin</u>, 7 F.3d at 1516.  Such encounters do not implicate the Fourth Amendment.  <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991)("The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.").  A police/citizen encounter remains consensual "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business . . . .'"  <u>Florida v. Bostick</u>, 501 U.S. at 434  (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 628 (1991)).  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968).

The United States Court of Appeals for the Tenth Circuit has held that "the stopping of a vehicle constitutes a 'seizure.'"  <u>United States v. Orrego-Fernandez</u>, 78 F.3d 1497, 1503 (10th Cir. 1996)(quoting <u>United States v. Walker</u>, 933 F.2d 812, 815 (10th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1093 . . . (1992)).  Thus, "[a] routine traffic stop is a seizure under the Fourth Amendment."  <u>United States v. West</u>, 219 F.3d 1171, 1176 (2000).

2.    __Investigative Detention__.

In Terry v. Ohio, the Supreme Court of the United States held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific, articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion.  See 392 U.S. at 21.  The officer's stop or seizure of a person must be based on reasonable suspicion, which can be supported by specific articulable facts, that the person was involved in wrongdoing.  See id.

Officers may ask the person questions during the Terry stop to dispel or confirm the officers' suspicions that a law is being violated.  See Florida v. Royer, 460 U.S. 491, 498 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975).  The detainee, however, is not obliged to respond.  See Berkemer v. McCarty, 468 U.S. 420, 439 (1984)(stating that "the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").  A police/citizen encounter that goes beyond the limits of a Terry stop is an arrest which must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

The court must conduct a two-part inquiry to determine whether an investigative detention is reasonable under the Fourth Amendment.  See United States v. King, 990 F.2d at 1557.

> To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold.  First, the officer's action must be justified at its inception. . . .  For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. . . .  For a protective search to be "justified at its inception," the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be entitled to make a forcible stop.

-10-

> The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is reasonably related in scope to the circumstances which justified the interference in the first place.

United States v. King, 990 F.2d at 1557 (internal citations and quotation marks omitted).

Neither "inarticulable hunches," nor "inchoate and unparticularized suspicion," will suffice to justify an investigative detention.  Terry v. Ohio, 392 U.S. at 22, 27.  In determining the reasonableness of an investigative detention, however, "'common sense and ordinary human experience must govern over rigid criteria.'"  United States v. Walraven, 892 F.2d 972, 975 (10th Cir. 1989)(quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).  An investigative detention may be unreasonable when it is a more serious intrusion on one's liberty than is allowable on the mere suspicion of criminal activity.  See United States v. King, 990 F.2d at 1557.

The Tenth Circuit has held that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  See  United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993)("A traffic stop is an investigative detention analogous to a Terry stop, in that, although probable cause is not required, the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping the automobile.").  "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle.  Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."  United States v. Botero-Ospina, 71 F.3d at 787 (quoting Delaware v. Prouse, 440 U.S. 648, 661 (1979).

"During a routine traffic stop, the detaining officer may request a driver's license and vehicle

registration, run a computer check on the car and driver, and issue a citation." United States v. Soto,
988 F.2d at 1554.  "If the officer wishes to detain the driver for further questioning unrelated to the
initial stop, the officer must have an objectively reasonable articulable suspicion that illegal activity
has occurred or is occurring."  United States v. Soto, 988 F.2d at 1554.

      **3.**    **Warrantless Arrests.**

      Under certain circumstances, a police officer may lawfully arrest an individual without an
arrest warrant, including when the officer witnesses an individual commit an offense in the officer's
presence.  In United States v. Watson, 423 U.S. 411 (1976), the Supreme Court stated:

> The cases construing the Fourth Amendment thus reflect the ancient common-law
> rule that a peace officer was permitted to arrest without a warrant for a misdemeanor
> or felony committed in his presence as well as for a felony not committed in his
> presence if there was reasonable ground for making the arrest.

423 U.S. at 418.  See Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)("A police officer may
arrest a person without a warrant if he has probable cause to believe that person committed a
crime.").  Thus, to protect the Fourth Amendment's right to be free from unreasonable seizure,
probable cause must support formal arrests or seizures that resemble formal arrests.  See Michigan
v. Summers, 452 U.S. 692, 700 (1981)(stating that "every arrest, and every seizure having the
essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.").

      Probable cause to arrest means a police officer has a reasonable belief that the person
arrested has committed or is committing a crime.  As the Supreme Court explained in  Wong Sun
v. United States, 371 U.S. 471 (1963):

> It is basic that an arrest with or without a warrant must stand upon firmer ground
> than mere suspicion . . . though the arresting officer need not have in hand evidence
> which would suffice to convict.  The quantum of information which constitutes
> probable cause -- evidence which would warrant a man of reasonable caution in the
> belief that a felony has been committed [ -- ] . . . must be measured by the facts of
> the particular case.

Id. at 479 (internal citations omitted).

> The crucial question for us then is whether knowledge of the related facts and circumstances gave the officer "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" . . . to believe that petitioner had committed or was committing a violation of the . . . law[]. If it did, the arrest, though without a warrant was lawful and the subsequent search of petitioner's person and the seizure of the found heroin were validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial.

Draper v. United States, 358 U.S. 307, 310-11 (1959). "Probable cause to arrest exists only when the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Valenzuela, 365 F.3d at 896 (10th Cir. 2004)(internal quotation marks omitted).

### 4.     **The Exclusionary Rule.**

When law enforcement officers obtain evidence in violation of the Constitution, the exclusionary rule generally precludes its use in a criminal prosecution of the victim of the illegal seizure. See Illinois v. Krull, 480 U.S. 340, 347 (1987)(citing Weeks v. United States, 232 U.S. 383 (1914)). The exclusionary remedy extends not only to the primary evidence obtained from the illegal seizure, but also to the indirect product of the seizure, the secondary evidence, or the "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341(1913).

> Evidence is not considered fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. at 487-88. "To suppress evidence as the fruit of [an] unlawful detention, [the defendant] must make two showings: [i] that the detention did violate his Fourth

Amendment rights; and [ii] that there is a factual nexus between the illegality and the challenged evidence." United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001)(internal quotations omitted).  Once the defendant has made those showings, then the government must prove that the evidence the defendant seeks to suppress "is not fruit of the poisonous tree, either by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." Id. (internal quotations omitted).  A defendant must show that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  Id. (internal quotations omitted).

Once the defendant has shown a causal connection between the illegal seizure and the specific evidence alleged to be the fruit of the seizure, the government has the burden of persuasion of showing that the evidence is admissible because it was obtained by means sufficiently distinguishable to be purged of the primary taint.  See Brown v. Illinois, 422 U.S. 590, 602-604 (1975); Wong Sun v. United States, 371 U.S. at 488.  Even "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." New York v. Harris, 495 U.S. 14, 19 (1990).

## ANALYSIS

Routine traffic stops are seizures under the Fourth Amendment.  See United States v. West, 219 F.3d at 1176.   Rodriguez-Gamboa challenges the validity of Flores' traffic stop on December 13, 2008.  The Court finds that Flores' manner of initiating contact with Rodriguez-Gamboa on December 13, 2008 constitutes a seizure, triggering Fourth Amendment scrutiny.  The Court finds, however, that Flores instigated a lawful traffic stop based on an observed traffic violation.

-14-

## I.     THE INITIAL TRAFFIC STOP WAS LAWFUL.

Though the details that Flores and Rodriguez-Gamboa relate about the traffic stop on December 13, 2008 are different,[8] the Court finds that it is indisputable that Rodriguez-Gamboa drove the wrong way onto an I-10 exit ramp marked clearly with a no-entry sign and against traffic. See Motion at 2; Gov. Response at 2.  New Mexico Traffic Code states, in relevant part:

One-way roadways and rotary traffic islands.

> A.     The state transportation commission may designate any highway or any separate roadway under its jurisdiction for one-way traffic and shall erect appropriate signs giving notice of that designation.

> B.     Upon a roadway designated and signposted for one-way traffic, a vehicle shall be driven only in the direction designated.

NMSA 1978, § 66-7-316.  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d at 787.  Flores' narrative that a nervous Rodriguez-Gamboa turned unlawfully onto the wrong ramp is credible, and the Court has no good or sound reason to disbelieve it.

It is also irrelevant that Flores may have had subjective motives for stopping Rodriguez-Gamboa's vehicle.  The Court's sole inquiry is "whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction."  United States v. Botero-Ospina, 71 F.3d at 787 (quoting Delaware v. Prouse, 440 U.S. at 661).  Any ulterior motive Flores may have had, such as a suspicion that Rodriguez-Gamboa was not in the country lawfully, is not alone sufficient to invalidate a traffic

---

[8] For example, how long Rodriguez-Gamboa was at the Love's traffic stop or whether he was originally driving eastbound or westbound on I-10 before exiting in Lordsburg.

stop based on an observed traffic violation.  Rather, under the circumstances, Flores was justified in pulling Rodriguez-Gamboa over after observing him driving the wrong direction on a one-way ramp, in violation of NMSA 1978, § 66-7-316.

Rodriguez-Gamboa argues the Court should find that Flores' story is false, citing to United States v. Bullock, 215 F. Supp. 2d 174 (D.D.C. 2002)(finding that an officer's justification for a stop was false because an intersection camera disproved the allegation that the defendant had run a red light), United States v. Ochoa, 4 F. Supp. 2d 1007 (D. Kan. 1998)(finding state troopers' testimony unconvincing and determining that the troopers had caused the defendant's vehicle to drift onto the shoulder, which they then used to justify a traffic stop), and United States v. Gilliam, 275 F. Supp. 2d 797 (W.D. Ky. 2003)(finding that a mistake of law did not justify a traffic stop).  These cases are distinguishable from this case.  There has been no evidence presented to rebut the fact that Rodriguez-Gamboa entered an exit ramp against traffic.  That action is in violation of a New Mexico traffic statute.  Finally, the Court does not find convincing Rodriguez-Gamboa's assertion that Flores signaled him to enter the exit ramp in the wrong direction.  Common sense militates against the assertion that an officer would direct a vehicle to enter a freeway ramp in the wrong direction against the flow of traffic.  Rodriguez-Gamboa's actions are not like the facts in United States v. Ochoa, where officers caused a driver to drive onto the shoulder of the road to justify a traffic stop, and the Court does not find the circumstances to be sufficiently similar to justify dismissing Flores' testimony as truthful.  The Court finds, therefore, that Flores' stop was not in violation of the Fourth Amendment.

## II.     THE TOTALITY OF THE CIRCUMSTANCES GAVE FLORES REASONABLE SUSPICION TO EXTEND THE DETENTION.

Upon a lawful traffic stop, an officer may lawfully request identification of the driver and

run a check for warrants.  See United States v. Soto, 988 F.2d at 1554 ("During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation.").  Rodriguez-Gamboa does not dispute that Flores could request his identification.  See Reply at 2-3.  He was not able to produce a proper driver's license and informed Flores that it was because he was in the country unlawfully.  See Tr. at 16:22-25 (Flores).  The New Mexico Traffic Code states, in relevant part:

Drivers must be licensed.

A.    Except those expressly exempted from the Motor Vehicle Code [66-1-1-NMSA 1978], no person shall drive any motor vehicle, neighborhood electric car or moped upon a highway in this state unless the person:

(1)    holds a valid license issued under the provisions of the Motor Vehicle Code . . . .

NMSA 1978, § 66-5-2.  Not having a valid driver's license is a misdemeanor, as is driving the wrong direction on a one-way highway ramp.  See NMSA 1978 § 66-8-116.  "Probable cause to arrest exists only when the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Valenzuela, 365 F.3d at 896 (10th Cir. 2004)(internal quotation marks omitted).  Flores witnessed the violation of two New Mexico traffic laws and thus had sufficient probable cause to detain Rodriguez-Gamboa pending the arrival of the Border Patrol agent.  The Court finds Flores' continued detention of Rodriguez-Gamboa did not violate the Fourth Amendment.

In conclusion, the Court finds that Rodriguez-Gamboa suffered no violation of his Fourth Amendment right to be free from unreasonable search and seizure.  Flores conducted himself in conformity with constitutional standards.  The initial stop was lawful, given that it was based on an

-17-

observed traffic violation, and Rodriguez-Gamboa's failure to produce a driver's license gave Flores

probable cause to detain Rodriguez-Gamboa until the arrival of the Border Patrol.  All of the

evidence seized as a result of Flores' traffic stop on December 13, 2008 was lawfully obtained.  The

Court therefore declines to apply the exclusionary rule to suppress that evidence.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence and Request for

Evidentiary Hearing is granted in part and denied in part.  Defendant's request for an evidentiary

hearing is granted.  The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory J. Fouratt
   United States Attorney
Norm Cairns
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*


John F. Robbenhaar
Federal Public Defender
Albuquerque, New Mexico

   *Attorney for the Defendant*

-18-